**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| R.C., an individual, | |
| Plaintiff, | Case No. 1:23-cv-00872 |
| v. | Judge James S. Gwin |
| **CHOICE HOTELS INTERNATIONAL, INC.;** **SIX CONTINENTS HOTELS, INC.; AND HOLIDAY HOSPITALITY FRANCHISING, LLC.** | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

<u>**SECOND AMENDED COMPLAINT**</u>

COMES NOW, Plaintiff R.C. ("Plaintiff" or "R.C."), by and through her undersigned counsel, and respectfully submits her Second Amended Complaint for damages and makes the following averments.

<u>**INTRODUCTION**</u>

1. Plaintiff R.C. is a survivor of human sex trafficking.

2. R.C.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

3. R.C. met two people that groomed her into trafficking. Ultimately those people — her traffickers —came to control every aspect of her life. The defining factor of the relationship between R.C. and her traffickers was that each night, R.C.'s traffickers forced her to have sex with men for money.

1

4. R.C. was trafficked in hotels owned by Defendants[1] Choice Hotels International, Inc. ("Choice"), Six Continents Hotels, Inc. ("Six Continents"), and Holiday Hospitality Franchising, LLC ("Holiday Hospitality"). R.C.'s traffickers rented hotel rooms for one purpose—a location to engage in sex trafficking.

5. At Defendants' hotels, R.C. was forced to engage in sex with many men every day. Every new customer was another instance R.C. was forced to have sex against her will—that is to say, R.C. was raped multiple times per day by multiple men when she stayed at Defendants' hotels.

6. R.C.'s traffickers forced her onto Defendants' property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

7. At some point, R.C. was able to escape the grasps of her traffickers and the prison of Defendants' hotel rooms.

8. R.C. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

9. R.C. brings this lawsuit in an attempt to hold the Defendants that imprisoned her, accountable for their role in her trafficking.

## **OVERVIEW OF TRAFFICKING**

10. A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

11. For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines

---

[1] Throughout this Complaint, when Plaintiff refers to "Defendants," that statement is alleged as to all Defendants named in this action, including Choice, Six Continents, and Holiday Hospitality. In the instances when Plaintiff alleges a fact as to only one Defendant, or some number of Defendants less than the total, the Complaint clearly names the Defendant to which the allegation is made.

and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from the trafficking occurring on their properties.

12.     Defendants knew and have known for decades that they profit from sex trafficking repeatedly occurring under their brand flags.

13.     Rather than taking timely and effective measures to stop profiting from this epidemic, Defendants choose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented for this explicit and apparent purpose.

14.     The sex trafficking industry alone generates an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[2] However, traffickers aren't the only profiteers. The hotel industry, including Defendants, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex. Hotels and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

15.     Defendants and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Defendants' own properties. Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project, created for the hospitality industry's use.

---

[2] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

16.     The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to do the very opposite: continuing with business as usual, so that Defendants and all industry participants continue to profit millions from participating in a venture in violation of § 1591(a).

17.     Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of R.C. on their properties.

18.     R.C., a survivor of sex trafficking, brings this action for damages against Defendants pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595. Each Defendant, knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1591(a).

**PARTIES**

19.     Plaintiff R.C. is a natural person and a resident and citizen of Akron, Ohio.

20.     Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

      a.     Due to the sensitive and intimate nature of the issues, Plaintiff R.C. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[3]

---

[3] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d

4

b.  Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[4] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[5] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[6]

c.  Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d.  Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[7]

e.  Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the

---

1058, 1069 (9th Cir. 2000).

[4] Fed. R. Civ. P. 10(a).

[5] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[6] Fed. R. Civ. P. 26(c).

[7] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

21.     **Defendant Choice Hotels International, Inc.** is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its headquarters in Rockville, Indianapolis and can be served through its registered agent, United States Corporation Company, at 3366 Riverside Dr. Suite 103, Upper Arlington, OH 43221.

22.     Choice owns, supervises, manages, controls, and/or operates the Econolodge located at 79 Rothrock Rd, Akron, Ohio 44321 ("Rothrock Econolodge")

    a.  The Rothrock Econolodge by Choice is a Choice brand property.[8]

    b.  Defendant Choice is the principal in an agency relationship with the Rothrock Econolodge by Choice. It is both directly and vicariously liable for the acts and/or omissions of the staff at its branded hotels, including the Rothrock Econolodge by Choice. Where R.C. was trafficked. The Rothrock Econolodge by Choice also has apparent agency for Choice so as to establish vicarious liability, in addition to an actual agency relationship.

    c.  Choice controlled and dictated the actions and inactions of the Rothrock Econolodge by Choice through highly specific and detailed brand standards, policies, and procedures.

    d.  Choice knowingly benefited, or received something of value, from its ventures at the Rothrock Econolodge by Choice through royalty payments,

---

[8] *Our Brands*, CHOICE HOTELS, https://www.choicehotels.com/about/brands (last visited Jun. 9, 26 2022).

licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where R.C. was trafficked, as well as in maintaining a positive public images for the Rothrock Econolodge by Choice. Choice also benefited from gathering personal data from the Wi-Fi it provided to customers including R.C. and her traffickers.

e. Choice is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, such as the Rothrock Econolodge by Choice, contracting to supply services in Ohio. Choice has derived substantial revenue from services rendered in Ohio, has caused injuries to R.C. in Ohio, and profited from a venture which unlawfully permitted criminals to sell R.C. for commercial sex at the Econolodge by Choice.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Choice, the allegation is that Choice engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Choice.

23. **Defendant Six Continents Hotels Inc.** ("Six Continents") is the ultimate parent company for a United Kingdom incorporated corporation InterContinental Hotels Group PLC ("IHG") in the United States. IHG manages the brands of approximately 5,600 hotels throughout almost 100 countries. Defendant Six Continents is responsible for all brand standards for IHG brand hotels in the United States. Defendant Six Continents also owns, operates, or otherwise manages the software program for making reservations at IHG brand hotels. Defendant Six

7

Continents may be served with service of process by serving its registered agent, United Agent Group Inc. 119 E. Court Street, Cincinnati, OH 45202.

24.     IHG provides franchise opportunities through **Defendant Holiday Hospitality Franchising, LLC** ("Holiday Hospitality"). Holiday Hospitality is a wholly-owned subsidiary of IHG. It is a Delaware corporation and can be served by its registered agent United Agent Group Inc. 119 E. Court Street, Cincinnati, OH 45202. [9]

25.     IHG owns, supervises, manages, controls and/or operates the Holiday Inn Express & Suites located at 898 Arlington Ridge E, Akron, OH 44312 ("Arlington Holiday Inn").

     a.  The Arlington Holiday Inn by IHG is classified as an IHG essential brand hotel.

     b.  IHG employees work throughout the Arlington Holiday Inn by IHG. IHG employees work jobs including front desk and housekeeping. IHG is the principal with control over nearly every element of operations at the Arlington Holiday Inn by IHG. IHG is liable, either directly, vicariously, or indirectly through an agency relationship, for the acts and/or omissions of the employees at its branded hotels, including the Arlington Holiday Inn by IHG where R.C. was trafficked. IHG has an actual and apparent agency relationship with the physical property owners of the Arlington Holiday Inn by IHG as to establish vicarious liability.

---

[9] Defendants Six Continents and Holiday Hospitality are referred to herein as the "IHG." Under these circumstances, these entities are one and the same for purposes of this lawsuit. Any reference to Six Continents or Holiday Hospitality is a reference to all the entities.

c. IHG controlled and dictated the actions and inactions of the Arlington Holiday Inn by IHG through highly specific and detailed brand standards, policies, and procedures.

d. IHG knowingly benefited, or received something of value, from its commercial business venture at the Arlington Holiday Inn by IHG through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where R.C. was trafficked, as well as in maintaining a positive public image for the Arlington Holiday Inn by IHG brand. IHG also benefited from gathering personal data from the Wi-Fi it provided to customers including R.C. and her traffickers.

e. IHG is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, such as the Arlington Holiday Inn by IHG, contracting to supply services in Ohio. IHG has derived substantial revenue from services rendered in Ohio, has caused injuries to R.C. in Ohio, and profited from a venture which unlawfully permitted criminals to sell R.C. for commercial sex at the Holiday Inn by IHG.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of IHG, the allegation is that IHG engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of IHG.

9

**JURISDICTION AND VENUE**

26. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and under 18 U.S.C. § 1595 because this action arises under the laws of the United States.

27. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(d).

28. Pursuant to Northern District of Ohio Local Rule 3.1(b)(3), this case is related to Case Nos. 2:23-cv-00867; and 2:23-cv-00871.

**FACTUAL BACKGROUND**

INTRODUCTION

29. R.C. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a).

30. The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1591, and thereby establishes a non-delegable duty of reasonable care.

31. An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[10] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues for sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

32. To save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures

---

[10] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

regarding suspected instances of human trafficking occurring at the branded properties. Furthermore, Defendants, did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

33. Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Defendants did not establish mandatory and secure reporting mechanisms at the point of sale.

34. With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like R.C. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties while Defendants reap the benefits.

35. Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

36. Defendants are jointly and severally liable for the Plaintiff's damages in this case.

## THE SEX TRAFFICKING OF PLAINTIFF R.C.

37. R.C. met her traffickers when she was twenty-three (23) years old.

38. By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, R.C. was held captive and sold for sex by her traffickers.

39. During the time that she was trafficked, R.C.'s traffickers frequently rented rooms at the Defendants' hotel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with R.C.

11

40.     Throughout her trafficking, R.C.'s traffickers used Defendants' Wi-Fi to connect with "johns" by posting or causing to be posted advertisements on Backpage advertising for R.C.'s availability for commercial sex at Defendants' locations.

41.     R.C. was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels.

42.     While under the coercive control of her traffickers, R.C. was imprisoned in hotel rooms rented by her traffickers and forced her to have sex for money. During that time, R.C. was trafficked in the following hotels:

   a.  Rothrock Econolodge by Choice located at 79 Rothrock Rd, Akron, OH 44321; and

   b.  Arlington Holiday Inn by IHG Defendants at 898 Arlington Ridge E, Akron, OH 44312.

43.     During the time she was trafficked, R.C.'s traffickers constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly at intervals.

44.     While at the Defendants' hotels, R.C.'s traffickers violently attacked and beat her, and psychologically tormented her, all to ensure that she could not escape.

45.     During her captivity at Defendants' hotels, R.C. was raped, continuously abused physically and verbally, psychologically tormented, kidnapped, and imprisoned in Defendants' brand hotels listed above.

46.     At the above-listed hotels, R.C. encountered the same staff on multiple occasions. Defendants' staff would have seen the signs of R.C.'s deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring loudly in areas of Defendants' properties.

47. Every time R.C. interacted with Defendants' staff, it was readily apparent that R.C. was under the control of her traffickers. R.C.'s traffickers were present with R.C. at check-in while she was forced to check in under her own name.

48. The traffickers of R.C. followed a repetitive and routine procedure during stays at the Defendants' hotels to which Defendants' hotels knew or should have known of R.C.'s trafficking because of a variety of factors detailed below:

**THE SEX TRAFFICKING OF R.C. AT THE ROTHROCK ECONOLODGE**

49. R.C. was subjected to sex trafficking at the Rothrock Econolodge by Choice located at 79 Rothrock Rd, Akron, OH 44321.

50. R.C. and her traffickers stayed at this Rothrock Econolodge by Choice from 2008 to 2013, rotating, frequently staying for weeks at a time, encountering the same staff, within this one-year period.

51. There was constant yelling and fighting between the traffickers and R.C. coming from the room at the Rothrock Econolodge by Choice. R.C.'s traffickers would physically beat R.C. in the room.

52. During her stays at the Rothrock Econolodge by Choice, several consistent red flags of human trafficking were present, including, but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large numbers of used condoms left in the trash; unusually large number of male visitors asking for R.C. or her traffickers at the front desk; unusually large number of male visitors going in and out of R.C.'s room; physical abuse in public spaces; visible signs of prior/private physical abuse; asking the front desk not to be disturbed; and loud noises of abuse or other violence audible to staff and/or other rooms.

13

53. R.C. was repeatedly raped and otherwise sexually abused hundreds of times at the Rothrock Econolodge by Choice.

54. These red flags were open and obvious to anyone working at the Rothrock Econolodge by Choice and lasted continuously for a year.

**THE SEX TRAFFICKING OF R.C. AT THE ARLINGTON HOLIDAY INN**

55. R.C. was subjected to sex trafficking at the Arlington Holiday Inn by IHG located at 898 Arlington Ridge E, Akron, OH 44312.

56. R.C. and her traffickers stayed at the Arlington Holiday Inn by IHG from 2008 to 2013, rotating, frequently staying for weeks at a time, encountering the same staff, within this one-year period.

57. At the Arlington Holiday Inn by IHG, R.C.'s traffickers were constantly having verbal fights with R.C. in the parking lots, constant yelling in the room, and violence in the room and in public areas throughout the hotel.

58. During her stays at the Arlington Holiday Inn by IHG, several consistent red flags of human trafficking were present, including, but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large numbers of used condoms left in the trash; unusually large number of male visitors asking for R.C. or her traffickers at the front desk; unusually large number of male visitors going in and out of R.C.'s room; visible signs of prior/private physical abuse; asking the front desk not to be disturbed; and loud noises of abuse or other violence audible to staff and/or other rooms.

59. Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at the Arlington Holiday Inn by IHG.

60.    These red flags were open and obvious to anyone working at the Arlington Holiday Inn by IHG and lasted continuously for a year.

**DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS**

61.    Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[11] The United Nations,[12] international non-profits,[13] and the U.S. Department of Homeland Security,[14] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

62.    For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms

---

[11] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[12] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[13] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[14] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

63.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[15] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[16] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

64.     The Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking.  The Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human trafficker.

65.     The Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

66.     The Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently

---

[15] *The Blue Heart Campaign,* UNITED NATIONS (2022),
https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime.
[16] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015),
https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

67.     A brief examination of just a handful of examples for each Hotel Defendant suffices to show the extraordinary frequency with which the Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations:

**CHOICE**

   a.  Regarding a stay in May of 2011 at the Econolodge by Choice where R.C. was trafficked, a hotel customer wrote a review saying, "Completely horrible experience. The halls smelled strongly of marijuana, the outside door didn't need a card to access (it was broken), thus, anyone could enter, poor management...they turned a blind eye to our report of the illegal activity we saw going on in their hotel & wanted nothing to do with it, we couldn't get all our money back despite the fact that we didn't end up staying there. Save yourself the stress & go elsewhere."

   b.  Regarding two separate stays in August of 2012 and July of 2014 at the Econolodge by Choice where R.C. was trafficked, two different hotel customers wrote reviews stating that they had found used condoms in public areas of the property: "There was a used condom in the parking lot next to the door when we left the next morning." (2014); "we were greeted with a used condom at the front if the hotel," (2012). Hotel management responded to the 2012 review in April of 2013.

   c.  Regarding a stay in November 2019 at the Econolodge by Choice where R.C. was trafficked, a hotel customer wrote a review saying, "This doesn't

17

even deserve 1 star in ma book. The rooms are clean the bathroom...yes. The toilet wobbles when your using it the shower floor creaks real loud like it's about fall in. I would not recommend this Hotel to anyone in Fairlawn, Ohio. Unless you are paying for an escort."

**IHG**

a.  Regarding a stay at a Holiday Inn in Cleveland, Ohio in June 2018, a hotel customer wrote, "Worst Hotel**:** The worst hotel experience I have had in decades. It is very surprising because it was 250 plus a night and there are pretty high ratings on TripAdvisor. It makes no sense. Hotel obviously taking advantage of people who need to be downtown for the attractions. The crowd in the lobby and in front of the hotel could not be seedier. The street below is too noisy. The check-in is weird - you have to go down a long corridor. The elevators - near impossible to figure out how to put card in. The HVAC in the room is incredibly (!) loud and their moving us to another room solved nothing. (Probably the most important problem because sleep is obviously the key. What about the Holiday Inn Express commercials?) My 12-year-old son wanted to change hotels because the place is gross and weird.**"**

b.  Regarding another stay at a Holiday Inn in Cleveland-Mayfield, Ohio in April 2018, a hotel customer wrote, "Red flags go off when you check in to what you think is a nicer quality hotel. . . Is drug trafficking a problem here or something? . . . At that place they told me the reason was because there's been trouble with drugs at the motel and the police kept tabs on who stayed

18

there. This Holiday Inn said it was because the local police do sweeps of their lot. Why? What is going on at your hotel?"

**DEFENDANTS FACILITATED THE TRAFFICKING OF R.C.**

68.     Each Defendant is a signatory of the Code[17] and thereby have promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

69.     Defendant Choice is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Choice publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Choice should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

70.     Defendant IHG is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and IHG publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, IHG should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

71.     Defendants profited from the sex trafficking of Plaintiff R.C. Defendants rented rooms to and provided Wi-Fi to R.C.'s traffickers when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where R.C. was trafficked. The hotel staff, especially front desk staff, at Defendants properties knew or should have known of the obvious signs of R.C.'s trafficking.

---

[17] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

72.     Defendants benefited from the steady stream of income that R.C.'s traffickers and "johns" bring to their hotel brands. Defendants profited from each and every room that R.C.'s traffickers and customers rented where R.C. was harbored and maintained for the purpose of sex trafficking. In addition, Defendants profited from data collected each and every time R.C.'s traffickers and customers used Defendants' Wi-Fi to advertise and solicit R.C. for commercial sex.

73.     Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of the benefits they were receiving from the human trafficking occurring at the locations where R.C. was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

74.     Moreover, Defendants repeatedly collected data on R.C., her trafficker, and her "johns" from her many stays at Defendants hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendant's employees witnessed the obvious signs of R.C.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop benefitting from sex trafficking from occurring in their hotels. If Defendants would have taken proper measures, Defendants would not have profited from R.C. and other victims like her being trafficked at their locations.

75.     Defendants discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where R.C. was trafficked. These policies included ongoing

20

communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, and alerts to hotels in high risk areas or in proximity to high-risk events and brags that is has field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

76. Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the properties where R.C. was trafficked and reported this to Defendants or would have if the Defendants did not fail to institute reasonable policies and procedures.

77. In addition, Defendants had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems. These systems, which Defendants required its branded properties to use, were defective in ensuring customer safety and, specifically, identifying and mitigating suspected and actual incidents of human trafficking on Defendants' properties.

78. A reasonably diligent hotel brand in the Defendants' position would have included policies and procedures to identify and mitigate guest safety issues related to human trafficking in its franchise agreements, brand standards, and systems standards. Upon information and belief, Defendants' branded properties would have expected this material to be included in Defendants' policies and procedures. By failing to include such policies and procedures, Defendants led the branded properties to be negligently managed.

79. Instead, Defendants negligently required the branded properties to adopt injurious procedures that allowed trafficking to continue and thrive at Defendants' properties, such as failing

to accurately identify customer complaints that raise red flags of trafficking and take meaningful steps to address them. Defendants provided and operated defective systems for daily property operations, management, policies, procedures, and training that were incapable of determining whether they were generating revenue as a result of renting rooms where victims of trafficking were harbored and sold for commercial sex.

80.     Defendants voluntarily undertook and assumed a duty to protect the safety of guests at the branded property where Plaintiff was trafficked, such as security, criminal activity, food safety, emergency response protocols, and fire equipment, among others.

81.     Defendants did not exercise reasonable due diligence and care in selecting franchisees to operate its branded properties. Defendants failed to conduct background checks and additional investigations to identify customer safety and security risks. Defendants failed to conduct investigations such as background checks background and additional due diligence to identify whether they sold and licensed their systems and brands to a company able to secure customer safety and security risks.

82.     Defendants negligently designed the layout and structure of the franchised unit or approved the layout and design of the interior or exterior of the hotel property so that red flags of human trafficking were hidden.

83.     Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

> a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company to hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

84. As a direct and proximate result of these egregious practices on the part of the Defendant Hotels, R.C. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**<u>DEFENDANTS' CONTROL OVER THEIR BRAND HOTELS</u>**

85. In the hotel industry, Defendants are major hotel corporations that hold, own,

23

manage, and operate trademarks, licenses, and standard operating systems for hotel brands. As parent companies with decades of expertise in the hotel industry, Defendants provide property owners with standard operating systems that control the daily operations and management of Defendants' branded properties.

86. Upon information and belief, it is a standard practice in the hospitality industry, followed by Defendants, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

87. Defendants provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

88. The staffing decisions at the individual hotel locations are sufficiently controlled by the Defendants as to render staff at those locations' agents and joint employees of the brand manager Defendants and the individual hotel locations. *See M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 972 (S.D. Ohio 2019).

89. The staff at individual locations, including the locations at which Plaintiff was trafficked, took affirmative actions, as agents of the Defendants, to provide lodging to individuals who the staff and the Defendants knew or should have known were engaged in human trafficking, therefore, upon information and belief, Defendants are vicariously liable.

90. Defendants provide their branded properties brand name recognition, marketing,

24

and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a substantial extent controlled by Defendants.[18] Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[19]

91. Defendants require their branded hotel properties to use a property management system, which is linked to Defendants' corporate network and data center, for, among other things, receiving reservations, processing credit card transactions, internet and technology, and guest safety.

92. Essentially, Defendants provide a hotel in a box. Branded property owners only provide the physical property, while Defendants provide everything else required to operate and manage the hotel down to the minute details of daily operation. Branded properties must follow Defendants' strict standards to receive the right to operate one of Defendants' brands.

93. Per the relevant franchise agreements,[20] Defendants may enforce their brand standards by means of periodic inspections of their brand hotel locations to monitor compliance. If Defendants' branded properties fail to comply with Defendants' standards, Defendants penalize properties with fees and the ultimate threat of termination of the franchise agreement.

**CHOICE**

94. Choice exercises day-to-day control over the Rothrock Econolodge by Choice and its other brand hotels through centralized corporate systems, training, policies, and brand

---

[18] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel- industry/.

[19] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

[20] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

standards. Choice implements and retains brand hotel control over, including control over the Rothrock Econolodge by Choice and, as either direct subsidiaries or under the terms of its franchise agreements.

95. Upon information and belief, Choice controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

a. Requiring the branded locations to use Choice's property management system;

b. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Choice's centralized systems;

c. Requiring branded locations to keep audit reports and other records;

d. Conducting regular inspections for compliance with franchise agreement terms and Choice's rules and regulations;

e. Providing marketing requirements and standardized marketing services for the branded locations;

f. Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

g. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

h. Requiring branded locations to install Choice's data transport system to share data with Choice corporate;

i. Providing training and orientation materials for branded property staff;

      j.    Requiring branded locations to make modifications to the branded properties upon Choice's request and to refrain from make substantial changes to the branded property without Choice's permission;

      k.    Regulating the rates for room rentals; and

      l.    Insurance coverage requirements.[21]

96. Choice jointly employs all staff located at the Rothrock Econolodge where R.C. was trafficked.

97. Choice manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Choice.[22]

98. Choice controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Choice's website, and mentions across its corporate media channels.[23]

99. Choice mandates usage of a cloud-based centralized property management system called ChoiceADVANTAGE to its branded locations.[24]

100. Choice controls all hotel reservations made across its branded locations on its centralized reservation system called Choice Edge.[25]

---

[21] See e.g. Comfort Inn 2020 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/comfort-inn-2020-fdd-franchise-information-costs-and-fees/

[22] *See* e.g. *Why Choice?,* CHOICE, https://choicehotelsdevelopment.com/why-choice (last visited Jun. 9, 2022). id. ("We've taken our teams' collective knowledge of hotel operations, technology, service and leadership, and developed the tools and resources our owners use every day to help run their businesses.").

[23] *Id.*

[24] *Connect the world through the power of hospitality*, CHOICE, https://www.choicehotels.com/about

[25] *Supra* n 101

101.    Through its national sales team, Choice controls the credit processing system and the centralized direct billing at its brand hotels, including the Indianapolis Rodeway Inn and Indianapolis Quality Inn by Choice.[26]

102.    Choice gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[27]

103.    Upon information and belief, Choice requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives Choice the ability to access, monitor, and harvest that internet data.

104.    Under the guise of maintaining its "brand standards," Choice also forces its branded hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[28]

105.    Choice requires branded properties to comply with its corporate policies relating to Security and Guest Safety, Human Rights, Ethics, Corporate Governance, and compliance with the law.[29]

### IHG

106.    IHG, exercises day-to-day control over the Arlington Holiday Inn by IHG and its other brand hotels through centralized corporate systems, training, policies, and brand standards. IHG implement and retain brand hotel control, including control over the Arlington Holiday Inn

---

[26] *Id.*

[27] Choice Hotels International, Inc. *Privacy & Security Policy,* https://www.choicehotels.com/legal/privacy-policy

[28] *See e.g.*, *Convert an Existing Hotel*, CHOICE HOTELS, https://choicehotelsdevelopment.com/ convert-a-hotel/#upscale (last visited Jun. 9, 2022).

[29] Choice claims to "strive to conduct [its] business operations free from violations of human rights" *See Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Jun. 6, 2022).

by IHG, as either direct subsidiaries or under the terms of its franchise agreements.

107.    Upon information and belief, IHG controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Providing the software, hardware, and platforms where data and information is shared with IHG corporate;

    b. Providing reservation and booking platforms where payment modes and suspicious reservations would suggest trafficking;

    c. Providing and controlling customer review and response platforms;

    d. Providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

    e. Requiring branded locations to use IHG vendors for marketing and advertising;

    f. Restricting what the branded location is able to sell or services it is able to offer;

    g. Requiring branded locations to source hotel infrastructure, furniture, food and beverage and other products from IHG approved suppliers;

    h. Requiring branded hotels to use IHG customer rewards program;

    i. Requiring branded hotels to use IHG property management software;

    j. Requiring branded hotels to use certain vendors for internet services, cybersecurity, virtual data management, or other requirements for Wi-Fi access and filtering;

    k. Providing IT support for all property management systems;

29

l. Setting employee wages;

m. Sharing profits;

n. Standardizing training methods for employees;

o. Building and maintaining the facility in a manner specified by the owner;

p. Conducting regular inspections and audits of the facility and operation by owner; and

q. Fixing prices.[30]

108.    IHG manage corporate training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by IHG.

109.    IHG control uniform and required reservation, marketing, customer support systems and loyalty programs at its brand hotels, including the Columbus Holiday Inn by IHG.[31]

110.    IHG collect data from branded properties regarding customers who stay at IHG's locations, interact with their websites, and rewards program members. IHG's Privacy Statement says it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests and website users.[32]

111.    IHG mandates that the design of the branded property complies with IHG's brand standards and requires branded locations to source from IHG's approved vendors.[33]

---

[30] *See e.g.* Holiday Inn 2016 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/crowne-plaza-hotels-resorts-2016-fdd-summary/

[31] *Support for Owners,* IHG Hotel Development, https://development.ihg.com/en/americas/home/develop-a-hotel/support-for-owners (last visited Jun. 22, 2022)

[32] *Privacy Statement,* IHG, https://www.ihg.com/content/us/en/customer-care/privacy_statement (last visited June 22, 2022)

[33] *Supra* n 112.

112.    IHG's team of corporate sales professionals oversee business development and revenue generation and manage business-to-business relationships for the branded properties.[34]

113.    IHG require branded properties to use IHG's corporate marketing and advertising resources and materials including online print, televisions, and high-profile sports and event sponsorships.[35]

114.    IHG requires branded properties to use IHG's centralized multi-channel reservation platform.[36]

115.    Through IHG's corporate revenue management team fixes the prices of room rentals at the branded properties to maximize profits, as well as make recommendations to brands to maximize revenues.[37]

116.    IHG require branded properties to use a Defendants' centralized corporate property management and operations system called FPS Leads.[38]

117.    IHG controls and provides centralized technology systems for hotel operations at its brand hotels, including systems its brand hotels must use to access shared customer data and reservations information. IHG also sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including  the Columbus Holiday Inn by IHG.[39]

118.    IHG jointly employs all staff located at the Holiday Inn where R.C. was trafficked.

---

[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id*.
[38] *Id.*
[39] *Id.*

IHG posts job openings for its branded properties on its central career posting website "careers.ihg.com."[40] IHG provides benefits to employees of its branded properties, and upon information and belief controls the terms and conditions of their employment.[41]

119.   IHG requires branded properties to comply with its corporate policies relating to Security and Guest Safety, Human Rights, Codes of Conduct, Corporate Governance, UN Global Compact commitments, and compliance with the law.[42]

## CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

120.   Plaintiff incorporates each foregoing allegation.

121.   Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

122.   Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

123.   Defendants have benefited as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low,

---

[40] *Join our extraordinary world,* IHG, https://careers.ihg.com/en/ (last visited Jun. 22, 2022)
[41] Matt Lennon, *IHG revamps staff benefits to boost talent attraction and retention,* Hotel Management (Sept. 21, 2022) https://www.hotelmanagement.com.au/2021/09/21/ihg-revamps-staff-benefits-to-boost-talent-retention/
[42] *Policies,* IHG, https://www.ihgplc.com/en/responsible-business/policies#:~:text=At%20IHG%2C%20we%20are%20committed,processes%20to%20uphold%20our%20commitment. (last visited Jun. 22, 2022)

maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff when they knew or should have known the trafficking was occurring. The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages.

124.    Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and properties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits obtained through unjust enrichment;

c. Restitution;

d. Statutory and/or treble damages, where available;

e. Punitive damages;

f. Attorneys' fees and expenses;

g. The costs of this action;

h. Pre- and post-judgment interest; and

i. Any other relief the Court or jury deems appropriate.

33

## **JURY DEMAND**

Plaintiff hereby demands a trial by struck jury.

Dated: June 27, 2023

Respectfully submitted,

*/s/ Steven C. Babin, Jr.*
Steven C. Babin, Jr. (0093584)
Jennifer J. El-Kadi (00100660)
**Babin Law, LLC**
65 East State Street, Suite 1300
Columbus, Ohio 43215
T: 614-761-8800
E: steven.babin@babinlaws.com /
Jennifer.elkadi@babinlaws.com /

34