UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| R.C. | CASE NO. 5:23-cv-00872 |
| Plaintiff, | OPINION & ORDER |
| v. | [Resolving Docs. 59, 61, 114, 115, 122, 124] |
| CHOICE HOTELS INTERNATIONAL, INC., et al., | |
| Defendant. | |

JAMES S. GWIN, UNITED STATES DISTRICT COURT JUDGE:

With this order, the Court considers whether a sex trafficking victim can go to trial on claims against a hotel franchisor when the plaintiff does not show evidence that the franchisor had any relevant power over the hotel franchisee who ran the hotel involved with the trafficking. And, the Court considers whether a sex trafficking victim can go to trial against a hotel franchisor when the plaintiff shows no evidence that the franchisor received any notice that the plaintiff or others similarly situated were being sex trafficked at the franchisee-owned and franchisee-operated hotel.

In this case, Plaintiff R.C. alleges that she was trafficked for sex. With this lawsuit, R.C. seeks to hold three hotel companies[1] liable for her trafficking under the Trafficking Victims Protection Reauthorization Act (Trafficking Victims Act).

But R.C. does not sue her alleged traffickers, nor does R.C. sue the actual hotels where she was trafficked. Instead, R.C. sues the franchisors of the hotels where she says she was trafficked and sues those franchisors' corporate parents.

---
[1] Plaintiff R.C. has settled with two of the three Defendants. Doc. 131.

Case No. **Error! Reference source not found.**
GWIN, J.

One of the three hotel companies, Defendant Choice Hotels International, Inc. filed a summary judgment motion. After carefully considering the record and briefing[2] in this case, the Court **GRANTS** Choice's motion.

## I. BACKGROUND

According to Plaintiff R.C., she met her primary trafficker in 2002, while she was dating the trafficker's friend.[3] R.C. says that, within three months, that trafficker began pimping her for sex.[4] R.C. testifies that her trafficker forced her into commercial sex by forcing her to become dependent on illegal drugs.[5]

In her complaint, Plaintiff R.C. alleges that her trafficking included the period between 2008 and 2013 when she was trafficked at an Akron, Ohio, Econo Lodge.[6] Plaintiff suggests that her traffickers kept her isolated and imprisoned during this period.[7]

Also in her complaint, R.C. says that her trafficking should have been obvious to the Econo Lodge staff. R.C. says that there was constant yelling and fighting sounds coming from her room.[8] R.C. also says that she frequently displayed visible physical-abuse signs.[9] And R.C. alleges that frequent linen change requests and large numbers of used condoms should have alerted Econo Lodge staff to the illicit sexual activity going on.[10]

---

[2] Plaintiff R.C. moved for leave to supplement her summary judgment opposition. Doc. 122. The Court **GRANTS** that motion.
[3] Doc. 119-3 at 39:10–14.
[4] *Id.* at 39:19–23.
[5] *Id.* at 40:23–41:7.
[6] Doc. 57 at ¶¶ 49–50.
[7] *Id.* at ¶¶ 2–3, 9, 38, 42.
[8] *Id.* at ¶ 51.
[9] *Id.* at ¶ 52.
[10] *Id.*

Case No. **Error! Reference source not found.**
GWIN, J.

However, Plaintiff R.C. sues the Econo Lodge's franchisor, Defendant Choice Hotels; she does not sue the owners or staff who ran the Econo Lodge. And R.C.'s deposition testimony also paints a different picture of her trafficking period than the pleadings suggest.

While R.C.'s pleadings suggest that her traffickers isolated and imprisoned her, R.C. acknowledged significant outside contact during her trafficking period.

For example, Plaintiff R.C. went to the hospital to give birth at least twice during her trafficking period.[11] Further, R.C. was in contact with adoption agencies during the period, and her children's adoptive parents paid for her housing.[12]

R.C. was also in contact with her parents during the trafficking period, acknowledging that her parents "bought [a] phone for [her]" during that time,[13] and that her parents brought her money when asked.[14]

Similarly, R.C. testified that she interacted with police "[m]ultiple times" during her trafficking.[15] And R.C. took a trip to Florida away from her traffickers during that time as well.[16]

Further, the record lacks evidence that Choice Hotels ever received notice about Plaintiff R.C.'s trafficking during the alleged trafficking period. While there is some evidence showing that Choice Hotels had some general knowledge about the human trafficking scourge,[17] there are no documents or testimony showing that the Akron Econo Lodge ever

---

[11] Doc. 119-3 at 118:4–18, 122:19–123:12, 126:7–9.
[12] *Id.* at 126:20–128:3.
[13] *Id.* at 241:16–21.
[14] *Id.* at 252:2–20.
[15] *Id.* at 225:19–23.
[16] *Id.* at 276:17–277:4.
[17] Doc. 126-1 at 22:10–14.

Case No. **Error! Reference source not found.**
GWIN, J.

told Choice Hotels that the Econo Lodge was dealing with sex trafficking issues or that R.C. was being trafficked.

## II.   LEGAL STANDARDS

### A.  Motions for Summary Judgment

Rule 56 allows courts to grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[18]

Courts decide whether there is a genuine factual dispute by applying a burden-shifting framework.  The moving party has the initial burden of production.[19]  When the nonmoving party bears the ultimate burden of proof at trial—as is the case here—the moving party can meet its initial burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case."[20]  The moving party "[need] not itself come forward with evidence affirmatively negating the disputed" claims.[21]

After the moving party meets its initial burden to show that there is no genuine factual dispute, it is up to the nonmoving party to rebut that showing.  To do so, "the nonmoving party must go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial."[22]  If the nonmoving party fails to show that there is a genuine trial issue, the moving party wins summary judgment.

When applying this burden-shifting approach, courts "draw[] all justifiable inferences in the light most favorable to the nonmoving party."[23]

---

[18] Fed R. Civ. P. 56(a).
[19] *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004).
[20] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).
[21] *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (citing *Celotex*, 477 U.S. at 323).
[22] *Horton*, 369 F.3d at 909 (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 324).
[23] *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Case No. **Error! Reference source not found.**
GWIN, J.

### B. Trafficking Victims Act Elements

The Trafficking Victims Act allows sex trafficking victims to bring civil suits against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [anti-trafficking and anti-slavery laws]."[24]

Based on this statutory language, a claim against sex trafficking beneficiaries has three elements: a plaintiff must show that the defendant (1) knowingly benefits, from (2) participation in a venture, that (3) the defendant knew or should have known engaged in a trafficking act prohibited by anti-sex-trafficking laws.[25]

## III. DISCUSSION

### A. Direct Liability

Plaintiff R.C.'s primary claim is that Defendant Choice Hotels is directly liable for a Trafficking Victims Act violation. This claim falters on the Trafficking Victims Act's participation requirement.

"Participation" ordinarily means "to take part in or share with others."[26] However far this meaning might reach, it is clear that a defendant cannot "take part in or share with" a sex trafficking venture unless that defendant has interaction with that venture.

The record shows no such interactions between Choice and Plaintiff's traffickers. As a franchisor, Choice Hotels is several steps removed from daily hotel operations. An

---

[24] *18 U.S.C. § 1595(a)*.
[25] *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019). Some courts add a fourth element: that the venture actually violated anti-sex-trafficking laws. *E.g.*, *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 (7th Cir. 2023); *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723 (11th Cir. 2021). The Court finds it unnecessary to introduce a fourth element because proof that a defendant knew or should have known a venture violated anti-sex-trafficking laws necessarily implies that the venture did violate anti-sex-trafficking laws.
[26] *Red Roof*, 21 F.4th at 725 (quoting dictionaries); *see also Doe 1 v. Apple Inc.*, No. 21-7135, --- F.4th ---, 2024 WL 925889, at *8 (D.C. Cir. Mar. 5, 2024) (the ordinary meaning of "participation in a venture" is "taking part or sharing in an enterprise or undertaking that involves danger, uncertainty, or risk, and potential gain").

Case No. **Error! Reference source not found.**
GWIN, J.

independent franchisee operates the Akron Econo Lodge that this case involves, not by Choice Hotels.[27]

Although Defendant Choice Hotels had general knowledge that sex trafficking afflicts the hotel industry, Choice had no contact with R.C.'s traffickers and received no specific notice of R.C.'s trafficking. Without direct contact, there can be no direct liability.[28]

To the extent that Plaintiff R.C. suggests the relevant venture in this case is the hotel venture between Choice and the Akron Econo Lodge, that argument fails. A "venture," for Trafficking Victims Act purposes, must be a sex trafficking venture.[29] And there is no evidence that the hotel venture between Choice and the Akron Econo Lodge ever committed a sex trafficking act. Instead, Choice collected a percentage of room rentals from the Akron Econo Lodge. Nothing more.

Therefore, the Court **GRANTS** summary judgment in favor of Choice Hotels on Plaintiff's direct liability theory.

### B. Vicarious Liability

In addition to Plaintiff R.C.'s direct liability theory, R.C. raises vicarious liability theories against Defendant Choice Hotels. R.C. argues that the Akron Econo Lodge violated the Trafficking Victims Act, and R.C. argues the Akron Econo Lodge's violation should be imputed to Choice Hotels. Specifically, R.C. seeks to impute liability via actual agency,

---

[27] Doc. 98-2.
[28] See *B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20-cv-00656-BLF, 2020 WL 4368214, at *5 (N.D. Cal. July 30, 2020) (finding that allegations about what franchisee hotels did to participate in a sex trafficking venture were not enough to state a claim for direct liability against the hotel franchisors and corporate parents because they do not "link[] *these Defendants* [] to the sex trafficking of *this Plaintiff* [], and thus fails to make a plausible claim for [Defendants'] direct 'participation in [a] venture'") (emphasis in original); *see also Red Roof*, 21 F.4th at 726–27 (receiving hotel room royalties does not establish participation).
[29] *Salesforce*, 76 F.4th at 553. The statutory language supports this requirement. The Trafficking Victims Act refers to "a venture which that person knew or should have known has engaged in an act in violation of this chapter," such as by committing a sex trafficking act. 18 U.S.C. § 1595(a). Since the relevant venture must be one that a defendant "knew or should have known" committed a sex trafficking act, it follows that the venture must have actually committed a sex trafficking act.

- 6 -

Case: 5:23-cv-00872-JG Doc #: 132 Filed: 04/02/24 7 of 12. PageID #: 4993

Case No. **Error! Reference source not found.**
GWIN, J.

apparent agency, joint employer, and joint venture theories. None are successful.[30]

### 1. Actual Agency

#### a. Applicable Law

The Court applies Ohio agency law to decide whether an actual agency relationship exists. Courts split on whether to apply federal common law or state law.[31] But either choice leads to the same outcome.

Even if federal common law applied, "[i]t does not follow . . . that the content of such a rule must be wholly the product of a federal court's own devising."[32] In fact, "federal courts often incorporate state law as the federal rule of decision."[33] In other words, the state law rule often effectively becomes federal common law.

The Supreme Court has stated "a strong inclination to adopt state law as the federal rule of decision when the federal statute is silent on a matter traditionally of state concern."[34] This presumption favoring incorporating state law "is particularly strong in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards."[35]

Thus, "federal courts should 'incorporat[e] [state law] as the federal rule of decision,' unless 'application of [the particular] state law [in question] would frustrate specific objectives of the federal programs.'"[36]

---

[30] Defendant Choice Hotels questions whether the Trafficking Victims Act allows for vicarious liability. Doc. 115 at 15. The Court does not address that issue in this Order because, even assuming that vicarious liability is available, the record does not support vicarious liability.

[31] *Compare J.C. v. Choice Hotels Int'l, Inc.*, No. 20-cv-00155-WHO, 2020 WL 3035794, at *1 (N.D. Cal. June 5, 2020) (applying federal common law), *with H.G. v. Inter-Cont'l Hotels Corp.*, 489 F. Supp. 3d 697, 707–08 (E.D. Mich. 2020) (applying state law).

[32] *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616 (6th Cir. 1998) (alteration in original) (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 97–98 (1991)).

[33] *Id.* (citations omitted).

[34] *Id.*

[35] *Kamen*, 500 U.S. at 98.

[36] *Id.* (quoting *United States v. Kimball Foods, Inc.*, 440 U.S. 715, 728 (1979)).

Case No. **Error! Reference source not found.**
GWIN, J.

States typically regulate agency, and there is little reason to believe that applying state agency law would frustrate the Trafficking Victims Act's specific goals. So even if federal common law applies, this Court incorporates Ohio agency law into federal common law.

Under Ohio law, the fact that two parties are also in a franchisor-franchisee relationship does not change the agency analysis. Courts "must scrutinize the relationship between persons who are franchisor-franchisee just as [they] would scrutinize any relationship in determining whether an agency relationship exists."[37]

"[T]he key factor in determining the existence of an agency relationship is the right of control vested in the principal."[38] Agency depends "not upon any *exercise* of control at the moment, but upon the *right* of control."[39] And importantly, the type of control required is control over "the daily operations of the business."[40]

### b. Agency Relationship

Applying the Ohio law principles discussed above, the Court finds that the record does not show sufficient evidence of an actual agency relationship between Choice Hotels and the Akron Econo Lodge.

A franchisee owns and runs the Akron Econo Lodge. In trying to hold Choice Hotels responsible for the Econo Lodge's actions, R.C. uses the franchise agreement between Choice and the Econo Lodge to argue that Choice had some control over the Econo Lodge.

---

[37] *Hamlin v. Motel Six*, No. 2000-CA-2, 2000 WL 731716, at *3 (Ohio Ct. App. June 9, 2000) (quoting *Taylor v. Checkrite, Ltd.*, 627 F. Supp. 415, 416 (S.D. Ohio 1986)).
[38] *Hamlin*, 2000 WL 731716, at *3 (citing *Taylor*, 627 F. Supp. at 416); *see also Starks v. Choice Hotels Int'l*, 887 N.E.2d 1244, 1246 (Ohio Ct. App. 2007); *Broock v. Nutri/Sys., Inc.*, 654 F. Supp. 7, 8 (S.D. Ohio 1986) (same).
[39] *Hamlin*, 2000 WL 731716, at *3 (emphasis added) (quoting *Taylor*, 627 F. Supp. at 417); *see also Al-Menhali v. Marriott Int'l Inc.*, No. 1:17-cv-1089, 2019 WL 13150207, at *16 (N.D. Ohio Mar. 29, 2019) (citing *Ross v. Burgan*, 126 N.E.2d 592, 596 (Ohio 1955)).
[40] *Puente v. Garcia*, No. C.A. L-86-134, 1986 WL 14372, at *2 (Ohio Ct. App. Dec. 12, 1986).

Case No. **Error! Reference source not found.**
GWIN, J.

However, the franchise agreement offers few control rights to Choice Hotels. The franchise agreement centers on the Econo Lodge's license to use Choice Hotels' registered trademarks. Trademarks signal the quality and consistency of goods and services.[41] Because trademarks look to associate a quality level with the mark, a failure to enforce quality standards can lead to a trademark's dilution or loss.[42]

The Choice franchise agreement places responsibility for complying with legal and regulatory requirements on the Akron Econo Lodge alone. The franchise agreement says: "It is not within the scope of reviews/inspections of hotels by Choice to determine the Franchisees' compliance with such laws, regulations, and codes, nor does Choice have the knowledge or expertise to make such determinations. Choice relies solely on representations from Franchisees that their hotels are in compliance."[43]

Choice's franchise agreement does give Choice some level of control over the Akron Econo Lodge by setting certain brand regulations.[44] But those regulations mostly focus on signage and offer little direction on issues unrelated to Choice's trademarks. That is, the franchise agreement focuses on avoiding trademark dilution by setting quality control standards.

As the Restatement (Third) of Agency explains, "setting standards in an agreement for acceptable service quality does not of itself create a right of control."[45] The characteristic

---

[41] *Westco Grp., Inc. v. K.B. & Assocs., Inc.*, 128 F. Supp. 2d 1082, 1087 (N.D. Ohio 2001) ("A trademark and trade name operate as indicators of origin, assuring consumers that the goods and services sold thereunder are of a uniform nature and quality.") (citation omitted).

[42] *Ritchie v. Williams*, 395 F.3d 283, 290 (6th Cir. 2005) (finding that a party abandoned a trademark when it failed to implement quality controls for one of its trademark licensees); *Westco,* 128 F. Supp. 2d at 1088 ("Thus, when an owner licenses a trademark or trade name to third parties, the owner has the duty to control quality.") (internal quotation marks and citation omitted).

[43] Doc. 115-2 at Page ID 2842.

[44] Doc. 98-2 at § 6.

[45] Restatement (Third) of Agency § 1.01 cmt. f(1). Ohio courts turn to the Restatement to develop Ohio agency law. *See Willoughby Hills Dev. & Distrib., Inc. v. Testa*, 120 N.E.3d 836, 842 (Ohio 2018) (discussing the Restatement (Third) of

Case No. **Error! Reference source not found.**
GWIN, J.

that "distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents" is the "power to give interim instructions."[46]

Most of the franchise agreement provisions that limit what the Akron Econo Lodge may do are no more than "standards in an agreement for acceptable service quality" because they are static provisions that do not give interim control rights.[47] The only possible source of interim control is the right for Choice Hotels to modify the applicable brand regulations during the franchise agreement's term.[48]

The problem for Plaintiff's actual agency theory is that the record evidence does not show that the brand regulations control the Akron Econo Lodge's day-to-day operations, such as hiring or firing employees, managing employee schedules, and other onsite management.[49] So, the Court **GRANTS** summary judgment in favor of Choice on Plaintiff's actual agency claims.

### 2. Apparent Agency

Under Ohio law,[50] apparent agency has two elements: "(1) the defendant made representations leading the plaintiff to reasonably believe that the wrongdoer was operating as an agent under the defendant's authority, and (2) the plaintiff was thereby induced to rely upon the ostensible agency relationship to his detriment."[51]

---

Agency and explaining that "[t]he relevant statutes did not provide an answer to the question, so we looked to common-law understandings embodied in the case law and the Restatement").
[46] Restatement (Third) of Agency § 1.01 cmt. f(1).
[47] *See* Doc. 98-2 at § 6.
[48] *Id.* at § 6.a.
[49] *See* Docs. 115-2, 115-3 (Choice brand standard excerpts); Docs. 126-1, 126-2 (Choice 30(b)(6) transcripts).
[50] The Court applies Ohio law here for the same reason it applied Ohio law to actual agency.
[51] *Shaffer v. Maier*, 627 N.E.2d 986, 988 (Ohio 1994).

Case No. **Error! Reference source not found.**
GWIN, J.

Plaintiff R.C. testified that she had no input in deciding the hotels she was brought to.[52] Since Plaintiff had no say in the hotels that she stayed at, she could not have relied on any apparent agency relationship to decide which hotel to go to. Plaintiff's apparent agency theory fails, and the Court **GRANTS** summary judgment for Choice on that theory.

### 3. Joint Employer

Plaintiff R.C. also contends that sufficient admissible evidence supports finding Choice can be liable for the Akron Econo Lodge's actions under the theory that Choice and the Econo Lodge jointly employed the Econo Lodge staff.

It is not clear that joint employer principles apply in the Trafficking Victims Act context. But even if those principles applied, Plaintiff has not shown that Choice was a joint employer.

The crux of the joint employer test is the amount of control that a company has over the terms and conditions of employment, such as hiring, firing, and work scheduling.[53]

In this case, no record evidence shows that Choice could hire or fire employees for the Akron Econo Lodge, nor that Choice could set work schedules for the Econo Lodge's employees. Moreover, there is no evidence that Choice could exercise other employer powers, such as promotion or discipline. Therefore, the Court **GRANTS** summary judgment to Choice on the joint employer theory.

### 4. Joint Venture

Finally, Plaintiff R.C. raises a joint venture theory. However, R.C. raises this joint venture theory for the first time in her summary judgment opposition.[54] It is well-established

---

[52] Doc. 115-5 at 255:21–256:1.
[53] *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 942 (D. Or. 2020); *M.A.*, 425 F. Supp. 3d at 972.
[54] *Compare* Doc. 57 (complaint), *with* Doc. 120 (summary judgment opposition).

- 11 -

Case No. **Error! Reference source not found.**
GWIN, J.

that "a plaintiff may not expand [her] claims to assert new theories for the first time in response to a summary judgment motion."[55]  So, the Court **DISMISSES** Plaintiff's joint venture theory.

## IV.     CONCLUSION

Although the record may be enough to establish triable jury questions about whether the *Akron Econo Lodge* violated the Trafficking Victims Act, Plaintiff R.C. has not shown evidence sufficient to create viable jury questions on any of her claims or theories against Choice Hotels.  Therefore, the Court **GRANTS** summary judgment to Choice Hotels in full.[56]

IT IS SO ORDERED.

Dated: April 2, 2024                    *s/     James S. Gwin*
                                        JAMES S. GWIN
                                        UNITED STATES DISTRICT JUDGE

---

[55] *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012) (collecting cases).
[56] Because summary judgment completely resolves this case, all other pending motions are **DENIED AS MOOT**.  The Court also declines to rule on Defendant Choice Hotels' evidentiary objections to Plaintiff's expert declarations and to a law review article (Doc. 125), because those documents are not material to the grounds for granting summary judgment. Whether or not the Court considers those documents would not change the Court's decision.

- 12 -